[No. B098924. Second Dist., Div. Two. Sept. 10, 1997.]

SOLOMON J. LᴇFLORE, Plaintiff and Respondent, v.
GRASS HARP PRODUCTIONS, INC., Defendant;
NEW LINE PRODUCTIONS, INC., et al., Claimants and Appellants.

**COUNSEL**

Stein & Kahan, Karen L. Dillon and Gregory A. Nylen for Claimants and Appellants.

Richards, Watson & Gershon and Gary E. Gans for Plaintiff and Respondent.

**OPINION**

**BOREN, P. J.**—This case involves a so-called "negative pickup" deal surrounding a motion picture production. Appellants assert that the term reflects a common business arrangement in the entertainment industry. The particular question presented here is whether the arrangement characterized as a "negative pickup" deal created in appellants a superior security interest in tangible film materials, specifically movie film negatives.

Appellants New Line Productions, Inc., New Line Cinema Corp., and Motion Picture Guarantors, Ltd. (MPG) entered this debtor judgment matter as third party claimants. They contend that they acquired a superior security interest in the motion picture THE GRASS HARP by virtue of a "negative pickup" contractual arrangement with Grass Harp Productions, Inc. (GHP), the film's producer. The superior court denied the third party claimants' claims to a superior security interest in the film materials and a right to possess them. As a result, Solomon J. LeFlore (respondent) executed a lien against the THE GRASS HARP film materials to satisfy a judgment against GHP. The third party claimants appeal from the superior court's orders denying their respective claims. Regardless of whatever interest a negative pickup deal may impart, it does not give appellants in this case a superior security interest. We affirm.

FACTUAL AND PROCEDURAL BACKGROUND

THE GRASS HARP is a motion picture adaptation of the Truman Capote novel and stars Walter Matthau, Jack Lemmon, Sissy Spacek, Piper Laurie and several other well-known performers. GHP is a partnership formed to produce the motion picture. LeFlore became involved in the project in November 1993. By oral agreement, LeFlore and GHP agreed that LeFlore would provide his services to arrange financing for the film's production. GHP agreed to pay LeFlore a fee based on a percentage of the financing that he obtained and to reimburse LeFlore for all out-of-pocket expenses incurred in performing the agreement.

LeFlore subsequently obtained $4,150,000 in financing for THE GRASS HARP. LeFlore claimed $48,325 in expenses plus $230,000 as his fee. After GHP paid him only $15,000, LeFlore filed a breach of contract action against GHP for the $263,325 balance. LeFlore and GHP stipulated to a judgment of $183,325. The superior court entered the judgment pursuant to written stipulation on June 29, 1995.

As the winner of a judgment, LeFlore naturally sought to execute it and collect. Consequently, the Los Angeles County Sheriff served a writ of execution and notice of levy on Foto-Kem Industries, Inc., a motion picture film laboratory in Burbank. The execution lien covered "any and all motion picture film and sound elements, including all negatives, prints and sound tracks, and all other property, held in the name of, or for the benefit [of], Grass Harp Productions, Inc." These film materials represent the tangible elements of the picture and the assets of GHP. Pursuant to the levy, the film negative of THE GRASS HARP later was delivered to the custody of the sheriff. It remains in the sheriff's possession awaiting sale pending the outcome of this appeal.[1]

New Line Cinema and New Line Productions subsequently intervened in the matter and, seeking to stop the sheriff's sale of the film materials, jointly asserted a third party claim of superior security interest to the property. A tangled web of contractual relationships formed the basis of this claim. According to the claim made by "New Line,"[2] 10 agreements and documents established its superior security interest. Appellants note that LeFlore is not a party to any of these agreements. Among the agreements, in a written contract between GHP and New Line Productions dated August 9, 1994,

[1]This film negative, however, does not carry the underlying rights of exploitation and distribution.
[2]We note that this case involves two New Line entities, New Line Productions and New Line Cinema. However, appellants confusingly refer only to "New Line" in a collective sense.

GHP granted to "New Line" a copyright mortgage and "first position security interest" to secure GHP's obligations including delivery of the completed film.[3] This agreement also specified that the film's budget would be subject to the approval of "New Line." The budget as approved by "New Line" did not include any payment of LeFlore's fee, leading to LeFlore's breach of contract action and later to the instant matter.

In the joint claim, "New Line" asserted that it "acquired its superior security interest and its right to possession of the Film Materials by virtue of its status as Distributor of the Picture, pursuant to a series of related written agreements entered into as of August 1994 and November 1994 between and among third party claimant New Line, defendant Grass Harp Productions, Inc. . . . and third parties Banque Paribas-Los Angeles Agency . . . Mayfair Entertainment International Limited . . . Motion Picture Guarantors Ltd. . . . and Foto-Kem Industries, Inc. . . . with respect to the financing and production of the Picture, which agreements are referred to collectively herein for convenience as the 'Grass Harp Agreements.' Pursuant to the Grass Harp Agreements, in consideration of New Line's agreement as Distributor of the Film and having certain rights in the distribution and exploitation of the Picture within the United States and Canada, New Line acquired, inter alia, a senior security interest in the Film Materials and further acquired the right to immediate possession and control of the Film Materials in the event of default by defendant Grass Harp Productions, Inc."

"New Line" further asserted that a default by GHP occurred prior to the service of LeFlore's writ of execution. Without identifying the default, "New Line" claimed that the total amount due or due to accrue on the obligation was at least $4,953,114, including interest. "New Line" accordingly claimed a security interest in this amount.

Pursuant to an August 9, 1994, agreement between New Line Productions and GHP, New Line Productions acquired the right to distribute THE GRASS HARP in the United States and Canada.[4] Banque Paribas financed the production with a loan of approximately $9 million. New Line Productions and Mayfair Entertainment each agreed to repay approximately one-half of the loan from Banque Paribas in exchange for their respective distribution rights to THE GRASS HARP. These payments were due upon delivery of the completed film by GHP.

---

[3]Again, the parties to this agreement are not entirely clear. At the outset, the document states that the parties are GHP and New Line Productions. The text then refers to "New Line" throughout the agreement. The contract also defines "New Line Companies" as "New Line Cinema Corporation and all of its subsidiaries." New Line Productions signed the agreement.

[4]Mayfair Entertainment International Limited acquired the foreign distribution rights to the picture pursuant to a January 31, 1994, agreement between itself, GHP, MPG, and Banque Paribas, Los Angeles Agency.

MPG entered the picture, so to speak, as the guarantor of the production through a completion guaranty agreement. For a fee and profit participation rights, the Canadian corporation guaranteed to Banque Paribas and to Mayfair Entertainment International Limited and New Line Productions, as distributors,[5] that GHP would complete and deliver THE GRASS HARP. GHP also entered into a producer's agreement with MPG dated November 1, 1994. Under this agreement, GHP promised to produce and deliver THE GRASS HARP and MPG agreed to guarantee to Banque Paribas, Mayfair Entertainment International Limited, and New Line Productions that GHP would fulfill its obligation. GHP granted MPG a security interest to secure its performance.[6]

MPG asserted a third party claim of superior security interest separately from the New Line entities. Like "New Line," MPG also claimed a superior security interest based on a tangled web of contractual relationships. MPG asserted that it "acquired its superior security interest and its right to possession of the Film Materials by virtue of its status as Completion Guarantor of the Picture, pursuant to a series of related written agreements entered into as of January 1994, August 1994 and November 1994 between and among third party claimant MPG, defendant Grass Harp Productions, Inc. . . . and third parties Banque Paribas-Los Angeles Agency . . . Mayfair Entertainment International Limited . . . New Line Productions, Inc. and New Line Cinema Corporation . . . and Foto-Kem Industries, Inc. . . . with respect to the financing and production of the Picture, which agreements are referred to collectively herein for convenience as the 'Grass Harp Agreements.' "

MPG further asserted: "Pursuant to the Grass Harp Agreements, in consideration of MPG's agreement as Completion Guarantor of the Film to guarantee production of the Picture and delivery of the Film Materials for distribution and exploitation, MPG acquired, inter alia, a senior security interest (second in seniority to Banque Paribas) in the Film Materials and further acquired the right to immediate possession and control of the Film

---

[5]In a subsequent interparty agreement, discussed, *post*, in footnote 6, the parties designated New Line Cinema and New Line Productions collectively as "Distributor."

[6]Of the numerous agreements in this case, one additional contractual relationship warrants mention. After all the separate agreements, New Line Productions, New Line Cinema, GHP, MPG, and Banque Paribas entered into a large interparty agreement to govern the relationships among all the various parties. This agreement was dated August 9, 1994. In the agreement, appellants also agreed that GHP's performance would be "waived or satisfied" upon delivery and acceptance of the completed motion picture as specified. A declaration by Lionel Ephraim, MPG's authorized agent in California, acknowledges that delivery was completed. Delivery apparently was accepted because Ephraim declared that "New Line" and Mayfair Entertainment International Limited paid Banque Paribas pursuant to the underlying agreements.

Materials in the event of default by defendant Grass Harp Productions, Inc. Such an event of default by Grass Harp Productions, Inc. occurred prior to the service of the . . . writ of execution." MPG cited 13 agreements and documents as encompassing the "Grass Harp Agreements" and establishing its superior security interest. MPG claimed a total amount due or due to accrue as $8,550,000. Like "New Line," MPG asserted that a default occurred prior to the service of the writ of execution but did not identify the default.

The superior court heard the third party claimants' respective claims separately. In regard to the joint New Line Productions and New Line Cinema third party claim, the court—without detailing reasons in its order—denied the claims with prejudice and ruled that the sheriff may proceed with the levy.[7] As for MPG's claim, the court ruled that MPG in effect lacked standing to pursue its third party claim in California. In a minute order, the court found that "Third Party Claimant, Motion Picture Guarantors Ltd., a Canadian Corporation, is conducting intrastate business in California and has failed to obtain a certificate of qualification from the Secretary of State and thus is unable to maintain an action in the Superior Court. Therefore, their third party claim is invalid and the property seized from the judgment debtor pursuant to levy may be applied to the judgment."

MPG thereafter filed a renewed verified third party claim. This claim reflected MPG's original third party status in virtually all respects, except MPG asserted that it was qualified to make a third party claim in California as an entity known as "London Guaranty." This version followed the same script, with the same asserted basis of MPG's superior security interest quoted above and used verbatim in the "London Guaranty" claim, except for an added phrase clarifying that the default was by "Grass Harp Productions, Inc." The London Guaranty version, like the original, also failed to specify the alleged default by GHP and claimed a security interest of $8,550,000. MPG's sequel was not a success, although the court did review the merits in that version. The court denied the claim, finding that MPG "does not have a security interest or lien superior to the levy of . . . LeFlore, that [MPG] does not have a right to possession of the property levied upon by . . . LeFlore, that the Los Angeles County Sheriff may proceed with the levy, and that the property levied upon may be applied to the judgment herein." This joint appeal followed.

CONTENTIONS

The third party claimants make numerous arguments that can be grouped into three broad contentions: (1) the superior court abused its discretion and

---

[7]New Line Productions and New Line Cinema next sought a writ of mandate from this court directing the superior court to sustain their claims and that an immediate stay be applied to prevent the sale of the film materials. We denied the petition.

committed reversible errors of law in disregarding "clear" evidence of "New Line's" senior, perfected security interests by misapplying relevant law and fundamentally misunderstanding the nature of the contractual relationship between the parties, (2) the superior court abused its discretion and committed reversible errors of law in disregarding "clear" evidence of MPG's senior, perfected security interests by misapplying relevant law and fundamentally misunderstanding the nature of the contractual relationship between the parties, and (3) in the public interest, the superior court's denial of the orders should be reversed because a contrary ruling would have a chilling effect on the business of financing independent films.

## DISCUSSION

The gravamen of appellants' argument on appeal is that the superior court "fundamentally misunderstood and mischaracterized the nature of the underlying contractual relationships between and among New Line, MPG, and GHP. Specifically, the court mistakenly attempted to pigeon-hole the complex series of multiparty agreements between the parties into a simple, two-party loan model because the court did not understand the nature of the parties' relationship, commonly known in the entertainment industry as a 'negative pickup deal.'" Appellants assert that the differences between a two-party deal and the multiparty "negative pickup" deal at hand do not legally alter the validity of their security interests.

While arguing that the court below misunderstood the parties' relationships within the context of the negative pickup deal, appellants' briefs on appeal fail to define specifically the type of business arrangement described by this somewhat cryptic term. Appellants also fail to cite any case authority recognizing or discussing such an arrangement. Our own research similarly did not disclose any precedent addressing a negative pickup deal.

Appellants do distinguish the arrangement at issue from a simple two-party loan. This sketch perhaps yields for this case at least a working description of the movie industry's conception of a negative pickup deal. Under a two-party arrangement, a debtor receives money from a creditor and then is obligated to repay the creditor. In this case, appellants argue, "New Line" and MPG incurred the obligation to pay *third parties on behalf of GHP*. These obligations stemmed from New Line Productions' agreement —in exchange for the film's domestic distribution rights—to pay Banque Paribas approximately half of the bank's loan to GHP upon delivery of the

completed film by GHP.[8] MPG incurred an obligation to a third party on behalf of GHP when it assumed responsibility for Banque Paribas's loan to GHP in the event that GHP failed to timely deliver the completed film product. Appellants maintain that they received perfected superior security interests in the film materials through these agreements and the other contracts that in toto constitute the negative pickup deal. They argue that the superior court erred in ignoring evidence, in the form of clear language in the several written agreements, of the superior security interests of "New Line" and MPG.

We find no error or abuse of discretion in regard to any appellant. Neither the New Line entities nor MPG, each discussed separately below, had perfected security interests superior to LeFlore's security interest.

## I. *The "New Line" Third Party Claim*

Division 9 of the California Uniform Commercial Code governs secured transactions. (Cal. U. Com. Code, § 9101 et seq.)[9] These sections cover any transaction intended to create a security interest in personal property or fixtures, including goods. (§ 9102, subd. (1)(a).) "Goods" within the definition of the Commercial Code include "all things which are movable at the time the security interest attaches." (§ 9105, subd. (1)(h).) This definition would include film materials, such as film negatives. A "security interest" is "an interest in personal property or fixtures which secures payment or performance of an obligation." (§ 1201, subd. (37)(a).)

A security interest only becomes enforceable against a debtor or third parties once three conditions exist: (1) the collateral is in the possession of the secured party pursuant to agreement, or the debtor has signed a security agreement which contains a description of the collateral, (2) value has been given, and (3) the debtor has rights in the collateral. (§ 9203, subd. (1).) A security interest attaches when it becomes enforceable against the debtor with respect to the collateral, with attachment occurring as soon as all the three previously enumerated conditions exist. (§ 9203, subd. (2).) Finally, in order to perfect the security interest, a financing statement must be

---

[8]As owner of the foreign distribution rights, Mayfair Entertainment International Limited incurred the same obligations and received the same rights as New Line Productions. Mayfair seemingly could also assert the same superior security interest as New Line has done in this case. Mayfair, however, is not a party to this case. The record does not indicate whether Mayfair has asserted a security interest in the film materials—or if Mayfair would have standing to do so in California.

[9]Unless indicated otherwise, all further statutory references are to the California Uniform Commercial Code.

filed. (§ 9302.)[10] The filing of a financing statement gives notice to and assures priority over interested third parties. (*New West Fruit Corp.* v. *Coastal Berry Corp.* (1991) 1 Cal.App.4th 92, 97 [11 Cal.Rptr.2d 664].)

■ "New Line" insists that it satisfied each of section 9203's three elements. These appellants accordingly maintain that they possessed a superior security interest and that the superior court ignored clear evidence and ample proof of the interest. We disagree.

The order denying the third party claims by New Line Productions and New Line Cinema did not detail grounds for the denial. Nonetheless, having reviewed the record in this case against the criteria mandated by section 9203, we hold that the court below could not have abused its discretion or erred in denying the claims. Although appellants refer to "New Line" in a collective sense perhaps to derive benefit by blurring the entities together, we must distinguish the two New Line entities for the sake of this discussion. In order for either New Line Productions or New Line Cinema to have a superior security interest, one or the other entity must satisfy all of the prongs outlined in section 9203. Neither New Line entity does so.

New Line Cinema appears to satisfy the first requirement. "New Line" relies on five types of agreements and documents to establish this element: the Grass Harp acquisition agreement, the first and second amendments to the Grass Harp acquisition agreement, the interparty agreement, three UCC-1 financing statements, and a copyright mortgage and assignment document. We have reviewed each of these documents. New Line Cinema is not a party to four of the items. The Grass Harp acquisition agreement and the first and second amendments to this agreement list the parties only as GHP and New Line Productions. The three UCC-1 financing statements grant a security interest in New Line Productions and do not refer to New Line Cinema. The copyright mortgage and assignment document lists the parties to the document only as GHP and New Line Productions.[11]

As for the interparty agreement between the various parties, New Line Cinema and GHP both are parties to that document. The agreement also discusses security interests and the order of the interests among the guarantor, the lending bank, and the distributor. The interparty agreement states that the distributor shall have a security interest subordinate to the guarantor and the lending bank. As occurs so often in this case, the identity of the

[10]This section enumerates several exceptions to the requirement that a financing statement be filed in order to perfect a security interest. None of these exceptions apply to this case.

[11]Moreover, the document states that "the following terms shall have the following meanings: . . . 'New Line' means New Line Productions, Inc."

parties switches or becomes muddled so that interpretation becomes difficult. While New Line Productions had been domestic distributor, the interparty agreement lists the distributor "collectively" as New Line Productions and New Line Cinema. We will assume arguendo that the interparty Agreement granted New Line Cinema a security interest and that New Line Cinema satisfies the threshold requirement of section 9203.

Turning to the second requirement, appellants have not provided evidence that New Line Cinema provided "value" to GHP. "New Line" collectively asserts that it paid advances to GHP and Banque Paribas upon delivery of the completed film. Appellants have not met their burden of proving that New Line Cinema made any of these value-giving payments so that New Line Cinema may satisfy this requirement. "New Line" has not provided documentary evidence that New Line Cinema made any of these payments. The papers and a declaration from New Line Cinema filed below state simply, without distinguishing which entity paid, that New Line made these payments. This evidence is insufficient to establish that any New Line entity has given "value" to GHP, an issue we will discuss, *post*, in more detail in regard to New Line Productions' asserted security interest. Since New Line Cinema does not satisfy all three requirements of section 9203, the superior court thus did not err or abuse its discretion in denying New Line Cinema's claim.

Finally, even if we could find that New Line Cinema had a security interest in the film materials, we would have to conclude that the interest has not been perfected. To perfect a security interest, a financing statement must be filed. (§ 9302, subd. (1).) In this case, three UCC-1 financing statements were filed with the California Secretary of State. All three statements list the secured party only as New Line Productions. The fact that New Line Cinema's name is not listed as a secured party renders any security interest unperfected. (§ 9402, subd. (1).) Without citing any authority, however, the New Line appellants insist that "there is no legal significance" that a subsidiary corporation rather than a parent corporation is listed on a UCC-1 financing statement because the security interest can be imputed. We decline this invitation to allow New Line and its subsidiaries to recast themselves when convenient in order to prevail. This contention also runs contrary to case law. (See *K.N.C. Wholesale, Inc.* v. *AWMCO, Inc.* (1976) 56 Cal.App.3d 315, 319-320 [128 Cal.Rptr. 345, 99 A.L.R.3d 473] [section 9402 requires names of parent and subsidiary on a financing statement to perfect a security interest in both entities].) As an unperfected security interest, any such interest held by New Line Cinema would be inferior to LeFlore's execution lien. The court thus could not have erred or abused its discretion because the evidence does not establish that New Line Cinema had a perfected superior security interest.

We next turn to whether New Line Productions satisfies the requirements of section 9203. As we discussed in regard to New Line Cinema, New Line Productions was a party to all the agreements on which "New Line" relies to satisfy the first prong of section 9203. These agreements and documents granted security interests. We will assume arguendo that these items also contained a description of the collateral. We thus will consider New Line Productions to have satisfied the threshold element.[12]

Although the order denying the New Line entities, claims did not specify grounds, the hearing transcript indicates that the court found that the New Line parties had not satisfied the second element: the value must have been given to GHP by the New Line parties. "New Line" asserts on appeal that it gave GHP "value" by paying $4.5 million to Banque Paribas on behalf of GHP and by advancing GHP approximately $193,000 prior to the time production began. The court determined that the New Line parties had not sufficiently established that the payment to Banque Paribas—which it claimed vested its ownership and security interest in the motion picture— had been made. The New Line parties provided only a declaration from Amy Gittleman, vice-president of legal and business affairs for New Line Cinema, stating that "New Line has paid to Banque Paribas the full amount of the Mandatory Delivery Payment for the motion picture." The court rejected the declaration alone as sufficient evidence of payment: "It's a legal conclusion. I don't know when it was paid, how it was paid. There's no check, there's nothing to show that it was paid." The court also added, "If I've got a check and it's properly in evidence and so forth, it's much more persuasive than a conclusionary statement."[13]

The "New Line" appellants assert that the court improperly refused and ignored this evidence. That assertion is unavailing. A court must weigh available evidence and make a decision based on the quality of that evidence. The court did so here. It did not ignore the New Line appellants' evidence; the court considered the proffered evidence and determined that it was insufficient to establish the New Line appellants' claim that they had provided "value" to GHP by paying Banque Paribas.[14] The Gittleman declaration merely constituted a legal conclusion. It did not indicate the basis of

[12]In his respondent's brief, LeFlore does not contest this element in regard to New Line Productions.

[13]The court refused a request by the New Line parties' counsel to continue the hearing for supplemental evidence on this point by stating that "today's the day" for deciding the case.

[14]Furthermore, at this point in the discussion, we are considering whether New Line Productions established that it provided "value" to GHP by paying Banque Paribas. New Line Productions itself would have had to have made the payment in order to satisfy this element. The Gittleman declaration does not help: It states only that "New Line" paid Banque Paribas, without distinguishing which New Line entity actually paid. Although respondent states in his

Gittleman's knowledge, how or when the payment was made, or which entity made the payment and to whom, or the amount paid. A court has discretion to refuse declarations providing only legal conclusions but not factual basis or evidence. (See *Northern Natural Gas Co.* v. *Superior Court* (1976) 64 Cal.App.3d 983, 994 [134 Cal.Rptr. 850] [court may properly strike legal conclusion in declaration because statements supported by documentary evidence are more persuasive than legal conclusion alone].) There was no abuse of discretion or error in regard to this evidence.

Regarding the assertion that "New Line" had advanced $193,000 to GHP, the New Line appellants assert that the court ignored this evidence. The record indicates otherwise. Counsel argued during the hearing that "the funds were advanced in November '94. That's when those particular funds were advanced to Grass Harp in addition to the bank's loan." The court clearly must have considered the issue and whatever evidence because it immediately responded, "Yes, but they're not payable, they're not payable yet. There's no evidence that they're in default." Clearly, there was no oversight of this argument or the evidence offered.

We must address the meaning of this statement because we do not read it as a finding that the New Line appellants established the second prong. The court did not make an express finding in the record or in its order that the "value" element of section 9203 was present. In any event, our review of the record does not support any finding that New Line Productions provided "value" to GHP in the form of advanced moneys. New Line Productions did not provide sufficient evidence. The New Line appellants argue in their opening brief that GHP received advances pursuant to the first and second amendments to the Grass Harp acquisition agreement. In the third party claim filed below, the New Line appellants also argued that value had been given to GHP in advances pursuant to the interparty agreement. New Line Productions was a party to these agreements. However, the record does not indicate any evidence from the New Line appellants as to when these advance payments were made, how they were made, and by which entity they were made. Indeed, during the hearing, counsel for the New Line appellants referred the court to "the third party claim itself" for evidence. While the claim included copies of these agreements as exhibits, these items alone are insufficient evidence that New Line Productions complied and made the advance payments that would satisfy the "value" element. New Line Productions thus has not satisfied the "value" requirement of section

---

brief that New Line Cinema paid Banque Paribas although New Line Productions was a party to the agreements claimed to establish the security interest, New Line Productions simply fails to establish that it satisfied the "value" element by paying Banque Paribas.

9203.[15] Accordingly, it cannot sustain its third party claim of a security interest.

Because neither New Line Cinema nor New Line Productions can establish a perfected superior security interest in the film materials, the "New Line" third party claim fails. We find no error or abuse of discretion by the superior court and affirm the order in regard to both New Line appellants.

## II. *MPG Third Party Claim*

MPG's contentions are substantially similar to the claims raised by the New Line appellants. Because we rejected New Line's claims of error and abuse of discretion, we need only address MPG's claims as they differ from New Line's claims or as they address MPG's individual situation.

MPG contends that the superior court abused its discretion and erred in finding that MPG does not have a security interest superior to LeFlore's lien or a right to possess the film materials. Like the New Line appellants, MPG argues that the court abused its discretion in ignoring evidence in the form of multiple agreements establishing this security interest. We are not persuaded.

Section 9203 also applies to this third party claim. The court below found that MPG did not have a superior security interest, but the court did not provide specific reasons for this conclusion. Our review of the record discloses no error or abuse of discretion in this determination.

Regarding the first requirement, MPG was a party to several agreements, including the interparty agreement in which GHP granted it a security interest. Assuming arguendo that the agreement contained an adequate description of secured collateral, we consider the first element satisfied. MPG asserts that the court erred in regard to the "value" element by ignoring evidence contained in over 500 pages of canceled checks and invoices that MPG had expended over $900,000 in purported overbudget expenses incurred during production of THE GRASS HARP.

---

[15]In regard to giving "value" to GHP, the New Line appellants assert that the trial court ignored evidence that "New Line" provided substantial nonmonetary value to GHP. As examples of such "value," "New Line" notes, inter alia, that it agreed to pay the bank upon delivery of the film. According to "New Line," GHP would not have been able to obtain bank financing to produce the film without this assistance. However, we cannot say that the court ignored this evidence. We find that the issue was not raised properly by the New Line appellants. The record does not indicate that the New Line appellants raised the point in the hearing or in their third party claim papers. On appeal, the New Line appellants simply cite to points addressing these examples of nonmonetary benefits within the lengthy Grass Harp acquisition agreement. We deem the point waived for appeal.

The record, however, does not establish that the court ignored this evidence. Counsel for MPG appeared at the hearing on MPG's third party claim without documentary evidence of the amounts expended by MPG. The court gave MPG until the following day to submit this evidence. MPG then did so. MPG merely asserts in a conclusory fashion that the court "ignored" this evidence. Although the court did not conduct an additional hearing following submission of the "value" evidence and its decision did not address the evidence or the "value" requirement, such does not establish that the court ignored the evidence. With no proof specifically establishing that the court ignored the evidence, we must presume the court did consider the evidence submitted. This unfounded contention of error consists purely of speculation.

Because the court did not divulge reasons for finding that MPG did not have a superior security interest, we do not know which of the requirements the court found not established.[16] However, reviewing the ruling for an abuse of discretion as appellants urge us to do, we do not find an abuse of discretion in the court's order denying MPG's third party claim. Our Supreme Court has instructed that ". . . a reviewing court should not disturb the exercise of a trial court's discretion unless it appears that there has been a miscarriage of justice." (*Denham* v. *Superior Court* (1970) 2 Cal.3d 557, 566 [86 Cal.Rptr. 65, 468 P.2d 193]). " 'Discretion is abused whenever, in its exercise, the court exceeds the bounds of reason, all of the circumstances before it being considered. The burden is on the party complaining to establish an abuse of discretion, and unless a clear case of abuse is shown and unless there has been a miscarriage of justice a reviewing court will not substitute its opinion and thereby divest the trial court of its discretionary power.' " (*Denham*, *supra*, 2 Cal.3d at p. 566, quoting *Loomis* v. *Loomis* (1960) 181 Cal.App.2d 345, 348-349 [5 Cal.Rptr. 550].)

 MPG has not met its burden of establishing an abuse of discretion in the court's denial of the third party claim. Its only contention in this regard is that the court ignored evidence that MPG had given "value" to GHP. As we explained, MPG has failed to establish this claim.

Considering all the evidence before the court, we can see how it reasonably could have found that MPG had not given "value" covered by a perfected security interest even if the 500 plus pages of checks and invoices

---

[16]On MPG's renewed third party claim, the parties again disputed whether MPG as a foreign corporation had the legal capacity to file a UCC-1 financing statement in California to perfect a security interest prior to service of LeFlore's levy. At the second of two hearings on this claim and the only hearing for which a transcript is available, the court indicated, "I still find that the third party claimant could bring the claim and that they had perfected through UCC." The court also stated that there had been a tentative ruling to find that MPG had a superior security interest to LeFlore's levy.

established that "value" had been given when MPG paid overbudget expenses. MPG asserted that the negative pickup deal obligated MPG as guarantor to guarantee delivery of the completed film to the distributors and to cover certain overbudget expenses and claims involving the movie. MPG argued that "these obligations, and its right to recoup its expenditures from revenues of the Picture that would otherwise go to GHP, are secured by its senior security interest in the Picture, including the tangible Film Materials."

Respondent argues that, at the time of his levy, the picture had been delivered so that GHP had fully performed its obligation. Accordingly, there was no performance by GHP left to secure and the security interest no longer applied to that obligation. Based on our reading of the arrangement that MPG obtained a security interest in return for its guarantee that GHP would deliver the film to the distributors, we agree that this obligation and the attached security interest ceased upon delivery of the completed film by GHP.

Respondent's assertion, that MPG's security interest was not so broad as to secure repayment by GHP of any overbudget expenses, is also well taken. We agree. MPG and respondent both point to paragraph 9(a) of the producer's agreement as governing the scope of MPG's security interest in the film materials. This section "grants to Guarantor a security interest" to secure the payment of "all moneys payable to Guarantor under this Agreement." This paragraph specifies other paragraphs of the agreement to identify the types of moneys secured by MPG's security interest: personnel costs, insurance payments, expenses incurred if the guarantor has to "take over" production of the film, and indemnification for any breach of warranties or representations.[17] None of these provisions address overbudget expenses. MPG, despite providing over 500 pages of invoices and checks, also has not demonstrated that it paid any of these types of expenses covered by its security interest as overbudget expenses. We conclude—as there was ample evidence for which the court below to conclude—that MPG has not shown that its security interest covered overbudget expenses or that the expenses covered by the security interest were not paid within the overbudget expenses.[18]

MPG has not established that a miscarriage of justice occurred in the denial of its third party superior security interest claim. Substantial evidence

---

[17]However, the agreement at paragraph 10(a)(vi) specifies that "[t]he cost of production exceeding the Approved Budget shall not, by itself, be an event of default hereunder . . . ." Thus, an overbudget expense alone would not be a default that would be covered by MPG's security interest.

[18]Also, in reviewing the evidence of overbudget expense payments offered to establish that MPG had given "value" to GHP, the court acted as a trier of fact. That role requires weighing evidence and assessing its credibility. The possibility remains that the court, as it certainly has the ability to do, simply did not find the deluge of paperwork to be credible or to be otherwise sufficient to establish the "value" requirement.

supports the superior court's order and we find no abuse of discretion or error.

III. *Reversal in Interest of Public Policy*

Finally, appellants make a cursory contention that reversal of the superior court's orders would be in the public interest because affirming the orders would have a "chilling effect" on the financing of independent films. Appellants argue that negative pickup deals are founded upon the notion that the security interests incorporated within the agreements are "unquestionably valid." They maintain that banks, guarantors, and distributors are willing to enter into negative pickup deals only because they can rely on these security interests.

Appellants cite no authority for this contention, and we find it unavailing. We strongly doubt that affirming the clearly proper orders in this case will undermine the financing, even through so-called negative pickup deals, of the thriving independent film industry. Instead, to prevent future litigation and confusion, we think that the entertainment industry could take a lesson from this case: Parties to contracts must be paid properly, security interests must be clearly established and perfected, and agreements and documents must clearly and consistently delineate the proper and particular party or entity.

DISPOSITION

The orders under review are affirmed.

Fukuto, J., and Ito, J.,* concurred.

---

*Judge of the Los Angeles Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.